Case numbers 11-5837, 6191, 6192, 9196, and 9198, USA v. Adrian Dorsey, et al. Argument not to exceed 30 minutes to be shared equally by the appellants. 30 minutes for the appellee. Beginning for appellant, James Monin. Your Honor, that's me, and I don't think there's enough chairs for everybody. I'll be happy to... Just work casually with this. You can make this work. Good morning, Your Honor. May it please the Court, I am James Monin. And I believe I have previously reserved two minutes of my time for rebuttal. Your Honor, Mr. Dorsey, I'm here on behalf of Adrian Dorsey, who was convicted among other defendants. And we raised two issues, obviously, sufficiency of the evidence, but also the prior conviction issue. There was a prior conviction of Mr. Dorsey's introduced at trial. And I frankly think that's the more colorable issue, so I would begin with that one. If you look at my own brief on that issue, and on the government's brief on that issue, I think the only fair reading of those, and from our research, is to say that there appears to be a split of authority, even within the Sixth Circuit itself, as to just exactly how that sort of evidence is to be treated within the court, within the federal system. There are certain cases that I have pointed to where the criteria for that are laid out in such a way that, I think in this particular case, the introduction of that prior conviction on Mr. Dorsey would not have been proper. The government has pointed to other cases where it certainly appears that that would have been proper. So I think it's just fair to say that there may be a split of authority on that. In the absence of an en banc determination of that, I think the course just simply has to go on a case-by-case basis. If it were improperly admitted, is it harmless? Your Honor, it's entirely possible that it is. There are a couple of different ways to look at it. Mr. Dorsey and another defendant, Kelly Miller, the government's case against those two is essentially almost identical. The prior conviction that was introduced against Mr. Dorsey is one of the very, very few places where the cases against those two differed. They did receive identical sentences. The answer to that question draws you into an analysis of one particular witness's testimony, and that was Tanika Eberts, which I addressed in the sufficiency of the evidence portion of my brief. You could argue that because Ms. Eberts was unable to identify or distinguish between the two defendants that were in this home on the date of the arrest, that the jury simply gave them both the same sentence and gave them both a reduced sentence because she could not distinguish between the two of them. If that's the case, then perhaps both defendants were convicted on evidence that was really only testified to against one of them, and Ms. Eberts couldn't say which one of the two it was. So that's where the two issues seem to merge, and it becomes a very difficult question. I would say if you decide that there is an analysis that needs to be made on the prior conviction issue, I would like to make a couple of points that, although they're made in the brief, I would like to emphasize them for the court's consideration. One is that the government initially asserted that its purpose in introducing that prior conviction was either absence of mistake or intent. It appears that they've abandoned the absence of mistake argument because they don't mention it at all in their brief. That assertion was made originally at the time that the notice was filed. In either event, Mr. Dorsey never alleged those as his defenses. He didn't allege a mistake, and he didn't allege that he didn't have any intent. He simply alleged he had nothing to do with this thing altogether. The other point I would make is that the judge never made a finding on the balancing test between the prejudicial effect and its probative value. Thank you. All right, who's up next? Russ Pryor here on behalf of Zoonomatics. Because of limited time, obviously, I don't want to retread anything that's in my briefs, but one issue that I probably didn't spend quite as much time as I should have on, as to the issue of raising my client's religious beliefs, one of the – The government didn't – it doesn't seem like that was the government's fault, or it doesn't seem like that was the aim, and they seem to be almost happenstance and bad luck, and then not pursued. Well, I understand that the first time I raised the objection was when Mr. McGirt had testified, and that actually draws me right into the first thing that I was going to say, is that the case that listed several factors that the court can balance that was cited in the government's brief listed as one of those factors where a strong curative instruction was given. Judge Jordan did indeed determine that Mr. McGirt's statement was sort of off the cuff or unsolicited, however he phrased it. In that case, then, the response was unresponsive, and the ruling that Judge Jordan gave, which was in a sidebar, was that just the objection was overruled, and there was no curative instruction at all as to that first objection that I made as to this issue. Now, a curative instruction was given on the infraction regarding Mr. Rush, and to get back to the question that you just asked, I mean, Mr. Rush was, I want to say he was on the stand for two days. He admitted, I believe, on cross-examination he met with agents 15 times. I think he met with the United States Attorney's Office, I think he said about five times extensively. Given the degree to which this particular issue, the 5% nation, this mathematical code that was used, given how ubiquitous that was throughout this case, that question had to be addressed, and given the fact that it was addressed with the previous witness, they had to have known what he was going to answer. Remind me, I should remember this, but before the case, did you do any motion limine or anything to say, listen, we've got this one thing that might come up. I'm a little concerned that my client's faith could be used against him by a jury here. I'd like to make it clear that that's not going to come up unless there's permission. I don't recall that one was filed, no, Your Honor. I believe that it was. The point about someone's faith, there's no reflexive rule that says you're not allowed to bring up the fact that a person worships here or there or doesn't worship at all. So it seems to me it's up to the defendant and the lawyer, generally, without egregious misconduct by the government, if you think there's a risk there, to let everyone know. Well, I don't recall what the litigation was leading up to trial. I know, obviously, they were going to go into the mathematical code, and I know that the judge was going to let that in. But he did admonish them not to bring up the faith. Correct. We're not going to discuss issues of religion. And then it got brought up again. I wouldn't say that any individual occurrence in this regard alone might have supported this argument, but it was the fact that it was multiple occurrences. And I guess the fear is the prejudice comes in when you've got a jury that this is sort of a foreign issue. I think we got the point. Thank you. Okay. Thanks very much. Who's next? Renee Parity for Appellant Ronnie Cooper. I'm reserving two minutes for rebuttal. I'm happy to answer any questions the Court has about any of the issues raised in the briefs, but I'm going to focus today on just two. The question of whether the district court erred in not granting Mr. Cooper's new trial motion and the question of whether his New York youthful offender conviction should have been used as a predicate offense in the career offender determination. First, turning to the new trial issue, in order to prove that Ronnie Cooper was guilty, the government had to show not just that the conspiracy existed, which absolutely they did, but that Cooper joined the conspiracy, participated in the conspiracy at issue in this trial. And I think if you take a look at the evidence below, setting aside for a moment Daniel Ballinger's testimony, there's a real concern that an innocent person may have been convicted. You just don't have substantial evidence linking Cooper to the conspiracy, setting aside for the moment the Ballinger testimony. You have a series of text messages about personal use amounts of marijuana, and this is listed in the government's own recitation of its evidence at pages 71 and 72 of the brief. So you have this series of text messages regarding marijuana and personal use amounts, sometimes Cooper asking Maddox to find those drugs, sometimes Maddox asking Cooper. You have a single text message where Cooper asks Maddox to put him in contact with someone who could give him that other thing, an $1,100 joint. You have a call session, 11615, that the government's agent identified as being from Cooper, despite the fact that it was not his regular cell phone. It was identified by each of Cooper's witnesses who actually knew Cooper as not his voice. And it was originally not identified as Cooper, and none of the other calls from that number were identified as Cooper by the government agent, in which there's a reference to a third man who has a sufficient amount of an unspecified drug for the moment but might not in the future. You have a $900 wire transfer from Maddox in his own name to Cooper in his own name. You have $9,000 that Maddox transferred to his own sister, again, in both of their own names, who was Cooper's wife. The testimony of Truane Sanders that on two occasions he sold $100 worth of powder cocaine in Utica, New York, far from the locus of the conspiracy. The green light conversation in which Cooper says, yeah, to the suggestion that Maddox wants Rush killed. And the fact that there's 756... The yeah with a question mark? That's not only in the government's transcript, but it is what the government's own expert described as his statement. She says that he's saying that he understands and is questioning that that is truly what he wants. It is not acquiescence. The government describes it as acquiescence. But if you look at Betsy Ulibarri's testimony on that point, she does not say Cooper acquiesced in that conversation. And the question mark is the government's own transcription. And if you listen to that conversation, which was provided to the court in Cooper's appendix, I believe that the government's transcription is accurate. It is a questioning yeah. Finally, the government points to the fact that there are 756 text messages between the men. What does questioning yes mean? Is it like, are you sure? Is that what you mean? It's kind of like... I'm saying that given how little other evidence there is, the fact that Cooper says, yeah, never went to Tennessee, doesn't take any steps to threaten Rush. You know, it's clear that Maddox is mostly angry and yelling. There's no sort of step taken. There's nothing Cooper does other than say, yeah. That's it. That's their evidence of a conspiracy to kill somebody. You know, again, I'm not saying it's insufficient. I did say it was insufficient as a matter of law, but I'm focusing here on the new trial motion because I think that's where this court really has the opportunity to look at the evidence, to review it, and say, you know what? There is a real possibility that Ronnie Cooper is serving 30 years for a conspiracy he did not enter into. It's clear that Ronnie Cooper was a drug user. It's clear he used drugs with his brother-in-law. It's clear that he engaged in some form of illegal behavior in Utica. What I don't think the government has proven, once you take a look at Ballinger's testimony as the only proof that he entered the conspiracy, and Ballinger's testimony has a thousand, no, but two very big reasons why this court should not look at it, which is, one, that he's a jailhouse informant. He's not part of the conspiracy. He knew Rupp Cooper for eight days. He gives testimony that's grossly inconsistent with every single other witness in this case, not a single other witness in this case puts Ronnie Cooper in Tennessee, not a single other witness in this case apologizes. You can keep going, but it will lead into your two minutes. That's all the morning you have. All right. I mean, I'll reserve the rest of it, but I frankly think a careful review of the evidence in this case and a careful review of Ballinger's reliability should lead this court to determine that an innocent man may very well have been convicted here. Thank you. Thank you. Thank you very much. My name is Dave Leonard. I represent Jason DeJesus. As far as the issues that I raised on appeal are concerned, with regard to the sufficiency of the evidence I rely upon in my brief, I want to focus on the sentencing issues today. And if I could reserve two minutes. Thank you. As the court knows, Mr. DeJesus was convicted of a conspiracy to possess with the intent to distribute 500 grams or more of powder and 50 grams or more of crack. The crack at the time in place was a 20-year mandatory minimum because of Mr. DeJesus' prior felony drug offense, and with regard to the powder it was 10. Now the government obviously has agreed that with regard to the crack sentence there should be a remand because the FSA. Obviously he falls within the new category of 28 to 280, and that helps us out a lot. That's good news. The other problem that I have is I just don't want the court to remand the case for the purposes of a re-sentence on that count alone because what Judge Jordan did, and I think he did it rather unwittingly at the time, he actually gave Mr. DeJesus 20 years on powder plus the 20 years on crack. You would prefer a general remand? A general remand for re-sentencing. That's fine, and we'll hear the government's perspective on it. I can tell you I had a case, Boyd, where we meant to do a limited remand. The district court thought it was a general remand, and on remand it was a Dorsey-related remand, and the district court raised the sentence. Okay. Now happily it worked out for Boyd because we decided on reviewing it a second time and it had been a limited remand. The district court judge didn't have that authority. I'm just telling you there's a bitter with sweet component to a general remand. I understand. Think about that. You and the government have agreed on a general remand? I think Mr. Taylor has agreed in his brief that there should be a remand because the FSA. But I don't think he's decided whether it should be general or limited. That's correct. I think that initially is up to you, and initially you want it to be general. And the reason being is because, of course, the 20 years on the powder, his guideline range was 121 to 151. We think it should be lower, which we'll argue in the district court upon the remand. But so Judge Jordan basically had been 20 years on the powder without any explanation of why he went over the guidelines almost two times. I don't have a problem with general remand. I'm just trying to make sure you're aware of the . . . I understand. I understand. He could zap us. I don't think he would in this particular case, and I'll take that chance. So will my client. Thank you. All right. Thank you. Who's up? Good morning, Your Honors. I'm Melissa Salinas representing Keith Ruffin, and I've reserved two minutes, please. I think this court should be troubled by . . . particularly troubled by two points in Mr. Ruffin's appeal. The first one is the fact that he received a 30-year sentence with no consideration for his motion for a departure under 5H1.4 when he has very, very serious health conditions. Namely, he's had four strokes, severe cardiac disease, and he's basically immobilized on one side of his body in severe pain. And I think the court's treatment of that issue was grossly inadequate in the sentencing hearing. But I realize I only have very limited time today, and I think the more complicated question is the issue of Mr. Ruffin's . . . the denial of Mr. Ruffin's . . . partial denial of his motion to suppress. I think the second set of statements made at the station house . . . You're not arguing for a remand based on Dorsey? Well, I'm focusing on the . . . So, you are arguing for it, but you're just not going to devote your oral argument time to it? That's correct. I'm not abandoning anything in the brief. But I do want to focus on . . . I think there's a lot of complicated law in the area of Pacheco-Lopez and Missouri v. Siebert that controls whether the court erred in denying Mr. Ruffin's motion to suppress. Pacheco-Lopez is controlling in this case. The facts are very similar, actually. Mr. Ruffin . . . the video is troubling. Mr. Ruffin was pulled over at the side of the road. And the Miranda warnings were very incomplete. He wasn't told of his right to have police present . . . or an attorney present during his questioning. And then, the officer, the agent, went right into . . . I want to talk to you, and let's talk about Mr. Maddox, and let's talk about drugs, and let's talk about your role in this conspiracy. There was a discussion, a specific admission, that there were two grams of cocaine at the house. There was an admission that he knew Mr. Maddox. And there were other discussions that were about why Mr. Ruffin needed to talk to this agent, both there and at the station house, linking those two together. This is a Miranda violation? This is plainly a Miranda violation. And the court ruled in our favor with respect to the statements made in the car, but ruled against us with regard to whether that tainted or somehow made inadmissible the second set of statements. Because he later signed a statement that he understood his rights. He did not sign anything, and they didn't . . . Conveniently, nothing was recorded at the station house, when what was recorded the first time around was clearly inadequate. But at the station house, Mr. Ruffin . . . It was 30 minutes later, and we have a footnote in our brief that calculates that minute . . . That the agent is referring to the interrogation at the station house from the get-go, and what he wants Mr. Ruffin to tell him, and why he has to do that to avoid spending 30 years in prison with his serious health conditions. So there's a . . . Not only does he gain information from the first set of questions and admissions, but he's also teeing him up for why he has to cooperate at that moment, and then this opportunity is gone the next day. The other thing that I think is very troubling is that you have testimony from the law enforcement . . . That their intent was to, and this is a quote, seize the opportunity to interview Mr. Ruffin before his counsel came in the next morning. So, you . . . This is going towards the exact piece of the Miranda warning that was left out, which is that you have the right to have your counsel present during this questioning that's happening. Was then, at the evidentiary hearing, law enforcement admits their goal was to talk to him before counsel gets here, to seize the opportunity. So, for all of these reasons, and I know my time is expiring here, the district court erred in denying the second part of his motion to suppress. Okay, thank you very much. We'll hear from Mr. Taylor. Good morning, Your Honors. Wayne Taylor. Initial incomplete Miranda warning. So, there's no question about that, and as counsel pointed out, the district judge ruled the first statement was inadmissible, and we freely conceded that. There was one Miranda warning that was not given, and it was certainly an incomplete Miranda warning. Okay, but they're saying this all tainted what happened later, right? That's the argument, correct. Okay, so how do you respond to that? We don't believe it did, because the statements given initially was I think what you have a situation is the agent is looking at an immediate situation. If there's going to be large amounts of drugs in the car or at the house, that's something immediately that law enforcement needs to deal with. What his ultimate goal was to see if Mr. Ruffin would cooperate or not, and on six different occasions, as cited in the brief, he asked if you want to talk, if you want to cooperate, we'll do it at the office, not at the car, not there, we'll do it at the office. That's said over and over again, so I think his intent is very clear. What about his point that it was done immediately in order to avoid counsel who was coming in the next morning? What about that point? Well, I understand that Agent Kimbrough testified during the suppression hearing that wanted to seize the opportunity to talk with him, but that's countered by the fact, and I think what he likely meant was What was said exactly about trying to avoid counsel who was coming in the next morning? What I recall is the testimony was that Agent Kimbrough said that they wanted to seize the opportunity to talk to him when they could there, but that's countered by the fact that Because his lawyer was coming in the next morning? Did he say that? Well, I don't recall that. I'm not sure if that was said or not. Are you saying that's drawing an inference from the statement? I would say it's drawing an inference from it, but the clear fact is that Agent Vicchio, when they took him to DEA following that situation and did the full hour-and-a-half, two-hour-long interview, gave him full Miranda warnings and delayed to talk to him until he got an attorney if he wanted.  You're saying that he was high on cocaine? I'm sorry, Your Honor. What about the claim? Wasn't it Ruffin that claims that he was messed up? Yes. And that he was unable. I'm a messed up man. And the judge indicated it was messed up legally, but wasn't his statement that he was messed up on cocaine? And then is he required to show it was coercion at that point if he's not got the ability, if he's messed up on cocaine? Yes, Your Honor. I think the answer to that is upon reading the context of the transcript and of that, when he's saying he's messed up is a nicer term than what was said. But the context of that is that he doesn't have a whole lot of cocaine. He's got two grams. Because then the agent asked him, Man, I know you ain't out that bad. And he agrees that he is. So the context is more not being intoxicated, but the quantity that he had at the time, being two grams, and that resulting legal situation, if any, that comes from that. Well, does he claim that it was that I was intoxicated at the time that you were trying to get me to make a statement? I don't know that that claim was ever made or was ever raised. He was then tested and it showed that there was cocaine in his system, right? He was tested, I guess, the following day by the Department of Probation when he was brought in. And it still showed? Well, it showed presumptively positive for cocaine, but that doesn't mean he was under the influence at that time necessarily. And just to address one other claim made by Mr. Ruffin as far as that test goes, again, that's a test that's provided by the Department of Probation, not by the Department of Justice or the U.S. Attorney's Office. And that is the results from that report, then, are provided directly to the parties and the judge. So the defense attorney had first access and first opportunity to see what the results of that were. That's a report that's kept by probation and given to the defendant by probation, to make that very clear anyway. But as far as being under the influence, I think the other pertinent evidence is that when Mr. Ruffin did give his statement at DEA, that it was a statement that was given an hour and a half to two hours. It was described and it's not been contested that it was a fairly friendly, cordial interview. It lasted for a considerable amount of time. If Mr. Ruffin had been under the influence, I think it's reasonable to deduce that the agents would have been able to tell that. He would have acted a certain way. And there was no testimony of that. There was no evidence. In fact, he gave a very detailed and lengthy statement and confession about his involvement with Mr. Maddox and other individuals from multiple states in cocaine dealing over an extended period of time. And giving details that would be completely inconsistent with his demeanor at the time and with the intricate details that were given. So all those would counter against, actually. Was the sentence a mandatory minimum? For Mr. Ruffin, Your Honor? It was not, Your Honor. He received a guideline sentence of 360 months to life, which, to address the, I think, Judge Seaton's issue, the Dorsey issue, where we acknowledge Mr. DeJesus is eligible for a general remand, I think. Mr. Ruffin is not. When the numbers are... But Ruffin's in the same boat in the sense of Dorsey having committed the act before the FSA was changed and then sentenced after, right? I think he's in that same boat, correct, Your Honor? And your point is what, that it can't have any impact? His offense level is actually a 38 and a 5, so that comes to a 300. And that's based on prior criminal history? No, that's just his offense level. Oh, sorry, right. His criminal history is a 5. But once you calculate all the drug weight up, Your Honor, it's... I thought it was the criminal history that was going to make it difficult for him to have any benefit from a new sentencing. I'm wrong about that? Well, he's a criminal history 5, so it's still a significant criminal history. But the base offense level is one of the main things that's going to drive why he's not eligible under Dorsey. But part of the sentence was for crack cocaine? Yes, sir. He was convicted for the cocaine conspiracy and the crack. He was sentenced after. Same problem he's got in the Dorsey case, in the Supreme Court's Dorsey case. Right. Same problem. It's the same issue, but the defendants are in different positions. His... Tell me this. Can you make the point that if you add up his criminal history and then you focus just on the powder cocaine problems, does that get you to the same range as Judge Jordan found thinking about crack as well? Right, Your Honor, because what you... I thought it wasn't exactly the same. You're saying it is? No, I believe... In other words, I thought it would make a modest difference. Your Honor, and I don't believe so. I know it was 5 kilograms of cocaine and 1.8 kilograms of crack cocaine. You convert everything to... So if you take the 5 kilograms of powder and his criminal history, you're saying he gets to the same range? Those are our calculations, Your Honor, which is the same in a PSR, which would have been 7,427.8 kilos, which would result in a base offense level 34 and then add two levels because he was convicted of money laundering conspiracy and two levels for the witness intimidation conspiracy, which results in a level 38. His guideline range is significantly higher than the statutory maximum converse to Mr. DeHasen. Well, the problem is you don't know how much Judge Jordan took into account in the sentencing the crack cocaine crime, right? Well, there's no way for us to know how much Judge Jordan based this sentence on because there was a crack cocaine expense in there. I know he based it on the drug quantity using the 2010 guidelines that already included the FSA range in the guidelines. So, again, that's why our calculations are that Mr. Ruffin would not be eligible for remand for Dorsey, but Mr. DeHasen is. Again, Mr. Ruffin, his guideline range is significantly over the statutory maximum and largely driven by the drug weight that he was held to. So just to repeat the point because I want to make sure Ruffin's lawyer has a chance to respond to it. The dialogue I was having with you is I was trying to figure out if all you had in this case was powder cocaine, the other offenses that don't relate to cocaine, in this criminal history you get to the same guidelines range. That's your assessment. I misunderstood, Your Honor. Okay. It would include... The guidelines range does go up a little bit because of the crack, doesn't it? Yes, it does. Okay. Because the crack cocaine and the powder cocaine are all converted to marijuana and aggregated together. So I apologize, Your Honor. I misunderstood the question, obviously. Okay. Yes. So that takes you back to Judge Merritt's point that if the crack offenses were affecting things, we just don't know what the judge might think about that in terms of variance discretion, Booker variance discretion. I understand. I believe Judge Jordan took that into consideration in doing the sentencing and creating a record. But I understand the questions from the... Yes, okay. All right. So is there anything else you wanted to say? I'm happy to address any other questions that the panel may have. In Maddox's life sentence, he's going to stay apparently in jail for the rest of his life, federal prison, right? Yes, sir. There is no crack cocaine part of the sentence? Crack cocaine doesn't affect any part of his sentence? Mr. Maddox was convicted on virtually everything he was charged with and overwhelmingly, but the cocaine conviction would drive that. It would be just mandated by Congress. I mean, it's statutory, a mandatory minimum of life based upon the cocaine charge, let alone even considering anything else, Judge Merritt. You're talking about powdered cocaine? Powdered cocaine, yes, sir. So crack cocaine didn't figure in in any way, shape, form, or fashion to his sentence here? Crack cocaine couldn't have had, you're saying, anything to do with the sentence here? I don't want to say it had nothing to do with the sentence, but the bottom line is that by virtue of Congress, by statute, there's mandatory life on the cocaine charge alone, and that's not quantity driven as long as it was sufficient to prove the charge, which the jury convicted him of. What about the Sixth Amendment argument, Maddox's argument that this mandatory life violates the Sixth Amendment? You mean Eighth Amendment? Eighth Amendment, cruel and unusual punishment. I'm thinking of this Almendarez-Torres that allows the judges – it's kind of hanging by a thread, isn't it? I guess my question is – It's on thread. It's been 20 years. But in light of Alain, don't you think we'll see this case again if Almendarez-Torres is overturned based on Alain? Your Honor, I can't say, but what we do know now is that, again, Congress has spoken on the issue and it's – It comes back. It comes back. Well, they're allowed to raise the point to the court. I mean, the court is obviously going to be the one that overrules Almendarez-Torres, so they can raise it, and maybe it is on a thread. The defendant has two prior felony drug convictions. He freely admitted that during the trial, although he claimed they were for marijuana instead of cocaine or crack cocaine. He basically is going to jail, prison for life, for nonviolent drug offenses, cocaine offenses, right? Your Honor, I would not agree with that. I mean, this case involved some very serious, certainly in our eyes, witness intimidation. The phone calls, recorded phone calls that were introduced during this trial with him threatening to kill, throw off a bridge, beat somebody's brains in, that sort of thing. The key witness who he felt was testifying against him, we take – That didn't have anything to do with the sentence, though, did it? Well, as it turns out, it doesn't, because he's already got two prior felony convictions and he's mandated by statute for life. But absent those, it certainly would have, because the witness intimidation would have added two levels, like it did with Mr. Cooper and like it did with Mr. – It wouldn't have been a mandatory life sentence. I'm sorry, Your Honor? The witness intimidation by itself would not have led to a mandatory life sentence. No, it sure would not have. So what about Cooper and the point about a new trial and really the only evidence is Ballinger, who was not to be trusted and so forth? What's your response to that? Your Honor, not – of the seven defendants who went to trial, for this court to affirm the judgments of the lower court in these sentences, you don't need to find that there was overwhelming evidence per Mr. Maddox for each one, but it's sufficient. And what you do have in this case is evidence from a number of different sources. Clearly, you have – But the Cooper argument is that, yes, fine, there was this massive conspiracy, but there's a real question about whether Cooper joined it. That's the point. Yes, Your Honor, and the answer to that is he did. And that's shown and was proved in evidence several different ways. First off, in no particular order, there are these wire transfers. Now, there's one to Mr. Cooper. There's a bunch that go to his wife from Mr. Maddox. Now, I know in the reply brief, counsel talks about that Mr. Cooper didn't use females or didn't use couriers because that was a common theme in this conspiracy, is using females so they wouldn't get caught themselves, using fictitious names and houses. But the significance to that is that they're going to Ms. Lukerson, his wife, again, a female use. Why is that important? Two different ways. Mr. Carr, whose case is being submitted on briefs, sent Ms. Lukerson a wire transfer under a fake name or alias. Why would he do that if there was nothing to hide to her? And secondly, Mr. Maddox, in a letter, a very significant letter that he wrote to his girlfriend, I know the panel is aware Mr. Maddox wrote numerous letters that were introduced, all of them very incriminating, but in one he flatly admits that he sent approximately $10,000 worth of wires to Kizzy Lukerson and categorized them specifically as money laundering because he's charged with $2 million in money laundering and he does the math, subtracts $10,000 from that, and says they've only got me for this amount of money laundering because of the ones that I sent to my girlfriend and to Kizzy Lukerson. So you have those. You have his involvement in the witness intimidation conspiracy. And I know there's a question about yes question mark, but when you read the entirety of the call, a couple other things I wanted to point out. At the beginning of that call, and maybe the most important part of it is the timing of it, immediately after the phone call from Mr. Maddox to Mr. Rush, where he leaves the threatening voicemail and essentially threatens his life, the very first call that's made within minutes is to Mr. Cooper. I think that shows his relationship with Mr. Maddox, and the first thing he says is, if you touch down again, if you ever come in contact with this boy, again, talking about Mr. Rush, it's not just talking about in theory, but if you come in contact with him, this is what I want. Later on down, he says, I'm just saying if you come into contact, don't let him talk that sweet talk mess. Ain't no love, you hear? And it goes on and on about him cooperating. I think he's cooperating. Mr. Cooper's response is, oh yeah. So you combine that, the timing of it, with the language it's used, and clearly he understood whether he acquiesced, whether he took an active step in going out and getting some of the goons that were referenced by Mr. Ruffin and Mr. Maddox or not. Still, you combine that with the testimony of Mr. Ballinger. What does Mr. Ballinger say? But Mr. Cooper told Mr. Ballinger that where we're from, we kill snitches and threaten to kill Mr. Ballinger, and that cooperates. Yeah, I think we have your answer. I think we're good. Thank you very much for answering our questions. We appreciate it. So I think we've got a few people with a little rebuttal. Your Honor, as I listened to the other defense attorneys testify, it occurred to me that perhaps I needed to clarify something. When I referred to Dorsey on my oral argument, I was referring to my client, Mr. Dorsey, not the Dorsey case. I got it. It's really unfortunate that Dorsey can't even use Dorsey. No, he can't. It's the first thing I thought about the case. Mr. Dorsey has no issues under Dorsey. It's outrageous. It's terrible. Your Honor, the only things I would say since Mr. – I'm sorry, since General Taylor listed the cases that he's relying upon on his conflict of authority, Haywood, Freeman, Bell, and Johnson. I would say that Your Honor brought up one very interesting point from General Taylor. That was that from a strategic standpoint, the government is only using these prior convictions on cases where they have less evidence, apparently. I would submit to the court that, obviously, the less evidence they have, the more the potential for the prejudicial effect becomes apparent when they're using a prior conviction. Thanks so much. I believe the only issue as to Mr. Maddox that was addressed by the government was the sentencing issue. I have nothing to add to my brief unless the court has any questions. No, thank you very much. Go ahead. First, I just want to say the government said that you need to find sufficient evidence. Of course, for the new trial motion, not merely sufficient, but leaving this court without a sense that there's a real possibility that Cooper was innocent. There are three things that the government pointed to. First was this wire transfer. Again, we're talking about a single $900 wire transfer to Cooper directly that Cooper introduced evidence was used to pay for his car repairs in both men's own names. No other wire transfer went to Cooper. Then about $9,000 in wire transfers went to Kizzy Lukerson, who was identified by the government as Ronnie Cooper's wife. She's also soon a Maddox's sister. It is the idea that there... That doesn't help. I think it actually significantly helps because it suggests that what Maddox is doing is sending money to his sister, not to his brother-in-law via his sister. We have to imagine that he's going to implicate his sister in this conspiracy in favor of his brother-in-law, that he's going to protect his brother-in-law in order to incriminate his sister by sending her this money. Also, as raised in the brief, the wire transfers don't... You know, this was promotional money laundering. This has to be money laundering that's then used for subsequently helping the conspiracy. There's no... Is that the timing of the intimidation call? So the timing of the intimidation call. It's true that it's right after he calls Rush. But what the government said, they said Cooper understood what Maddox meant. It's clear Cooper understood what Maddox meant. Maddox said, if you ever come to Tennessee, which, mind you, he had never done before, Rush never mentions Cooper. Cooper and Rush never met from the government's evidence. There's no evidence Cooper was ever in Tennessee, ever came to Tennessee. Why would he be calling him to tell him to go out and beat up somebody who lives in an area that he's never been to and is someone he doesn't know? But he doesn't tell Cooper to go beat him up. He says, if you ever encounter Rush, you should know he's cooperating. You should know there's a green light on him. He doesn't say anything... Why should he want him to know that? I think because, at that point, Rush was one of the many people arrested in this conspiracy. Maddox called Cooper all the time. There's 756 text messages between them during the course of the conspiracy. Only about 15 relate to drugs. These are men who have a friendship. They're friends. They are co-defendants in this case. There's no joining of Cooper in Maddox's... Maybe Maddox did want him. Even if Maddox called him because he did want him to go beat up Rush, there's no evidence that Cooper took that and went with it and joined the conspiracy. Thank you very much. Okay. You didn't reserve any, and I don't think you needed to. I don't need any. Okay, great. Thank you. Melissa Salinas again for Keith Paris-Ruffin. I did want to address... Counsel waffled a bit on what Agent Kimbrough said at the evidentiary hearing about whether he said he was going to seize the opportunity to interview him without counsel. Yeah, is without counsel part of the statement? Correct. It says, yes, we usually seize the opportunity to interview someone prior to being appointed counsel. And, yes, yes, we do do that. And that's exactly what happened on that night. You seize the opportunity. The answer is absolutely. I mean, what does that mean? I mean, if you Mirandize them, I mean, I guess the question is whether the Constitution allows you to want to interview someone without counsel after proper Miranda warnings. You could have that policy. I think this comes into play under the Siebert test. We're looking at whether there's an intent to circumvent Miranda. And the first set of statements in the car are lobbying Mr. Ruffin, all the reasons why he has to talk that night. And then when you get to the station house and the officers are admitting at the evidentiary hearing that their goal all along was to get him to talk before counsel comes in, then you do have an intent to circumvent Miranda. Maybe I need to go look at the record, but, I mean, I guess the way I'm understanding it is there's this general statement of, yes, we always seize the opportunity, I mean, yes, we'd much rather talk to them right then and there rather than wait two days with counsel. They're actually allowed to have that view as long as they properly Mirandize someone. Right, but the question here is whether the beginning piece of the interaction in the car was geared or was continuous first, and second, also, if you are adopting the concurrence in Siebert, the question then turns to whether there was any intent to circumvent Miranda as a whole. So I'm saying that in the car, all of these statements were about you need to come to the office and you need to talk to us, and if you don't, these are the things that you're facing 30 years with. Do you think the seize the opportunity statement relates to this interrogation or to interrogations in general by this police department? I think it relates to both. I think he's being very honest that that's what he was doing on that day as well as what they do in general. Great. I think we've heard from everybody, right? Okay, thanks to all for your helpful briefs and oral arguments for answering our questions. We really appreciate it. The cases will be submitted.